UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | Case: 1:25-mj-00241 |
| ANDREI SAMUILOVSKI, | : | Assigned To : Upadhyaya, Moxila A. |
| | : | Assign. Date : 10/10/2025 |
| | : | Description: COMPLAINT W/ARREST WARRANT |
| Defendant. | : | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Samuel Brown, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of a criminal complaint charging Andrei Samuilovski ("SAMUILOVSKI") with violations of 18 U.S.C. §§ 371 (conspiracy), 1956(h) (conspiracy to launder monetary instruments), 554 (smuggling from the United States), and 50 U.S.C. § 4819 (the Export Control Reform Act of 2018 ("ECRA")).

2. I am a Special Agent with the U.S. Department of Commerce ("DOC"), Office of Export Enforcement ("OEE"). I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and I am authorized by law to conduct investigations into alleged violations of federal law. The OEE is an office within the DOC's Bureau of Industry and Security ("BIS") that, among its duties, protects national security, foreign policy, and economic interests by investigating violations and violators of export control laws, including the Export Administration Regulations ("EAR"). I have served in OEE since August 2018 and am authorized to investigate and make arrests for offenses involving the unlawful export of goods and technology to destinations outside of the United States. Prior to joining OEE, my relevant

employment history was as follows: Deputy U.S. Marshal for the U.S. Department of Justice, U.S. Marshals Service (2016-2018); Special Agent for the U.S. Department of State, Office of Inspector General (2015-2016); and Special Agent for the U.S. Department of Defense, Air Force Office of Special Investigations (2011-2015). During my career, I have personally led or participated in various criminal investigations involving suspected and actual violations of the United States Code, federal regulations, and Uniform Code of Military Justice.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint. It does not set forth all my knowledge, or the knowledge of others, about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that SAMUILOVSKI committed violations of 18 U.S.C. §§ 371 (conspiracy), 1956(h) (conspiracy to launder monetary instruments), 554 (smuggling from the United States) and 50 U.S.C. § 4819 (ECRA), as described below.

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C., *see* 18 U.S.C. § 3237.

## PROBABLE CAUSE

### Statutory Background

6. Conspiracy: It is unlawful for two or more persons to conspire either to commit any offense against the United States or to defraud the United States or any agency thereof in any manner or for any purpose. *See* 18 U.S.C. § 371.

7. ECRA: ECRA provides statutory authority for the government to regulate exports from the United States to further the national security and foreign policy of the United States. 50 U.S.C. § 4811(2). Specifically, ECRA grants the President the authority to control, *inter alia*, the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by U.S. or foreign persons. *Id.* § 4812(a).

8. It is unlawful for a person to willfully violate, attempt to violate, conspire to violate, or cause a violation of ECRA or of any regulation, order, license, or other authorization issued under ECRA. *Id.* § 4819.

9. The EAR, Title 15, Code of Federal Regulations, Parts 730-774, were promulgated by the United States Department of Commerce, Bureau of Industry and Security ("BIS") pursuant to ECRA. In particular, the EAR restrict the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. The EAR impose licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully re-exported from one foreign destination to another. The most sensitive items subject to EAR controls are identified on the DOC's Commerce Control List ("CCL"), published at 15 C.F.R. part 774, Supp.

No. 1. Items on the CCL are categorized by Export Control Classification Number ("ECCN"), each of which has export control requirements depending on destination, end use, and end user.[1]

10. On or about February 24, 2022, in response to Russia's invasion of Ukraine, BIS amended the EAR to, among other things, require a license for exports or reexports to Russia of items classified under any ECCN in Categories 3 through 9 of the CCL. 87 Fed. Reg. 12226 (March 3, 2022). Effective April 8, 2022, BIS again amended the EAR to require a license for all items on the CCL destined for Russia. 87 Fed. Reg. 22130 (April 14, 2022).

11. In addition, BIS has identified six-digit Harmonized Tariff Schedule ("HTS") Codes that correspond to items that Russia seeks to procure for or in support of its war effort. Such codes, also referred to as HTS-6 Codes, are identified in Supplement No. 4 to 15 C.F.R. § 746 (Russian and Belarusian Industry Sector Sanctions Pursuant to 15 C.F.R. § 746.5(a)(1)(ii)). Under the EAR, an export license is required to export, reexport, or transfer (in-country) any item identified in Supplement No. 4 to or within Russia or Belarus, subject to limited exception. Such license applications are reviewed under a policy of denial.

12. Smuggling: Title 18, United States Code, Section 554 provides that whoever,

> fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States, shall be [be guilty of a crime].

---

[1] ECCNs are five-character, alpha-numeric designations used on the CCL to identify dual-use items for export control purposes. An ECCN categorizes items based on the nature of the product, i.e., type of commodity, software, or technology and its respective technical parameters. 15 C.F.R. § 738.2.

13. Money Laundering: Title 18, United States Code, Sections 1956(a)(2) and (c)(7)(D), provide, in pertinent part:

> (a)(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
>
> (A) with the intent to promote the carrying on of specified unlawful activity…
>
> shall be [guilty of a crime].

The term "specified unlawful activity" includes violations of the smuggling statute. Further, 18 U.S.C. § 1956(h) prohibits conspiracies to commit an offense described in § 1956, including activities described in § 1956(a)(2).

**Details of Probable Cause**

14. As described herein, beginning in or around early 2022 and continuing through at least December 2024, SAMUILOVSKI conspired with Co-Conspirator 1, and others, to supply prohibited Russian end users with aerospace-related components, in violation of U.S. export laws.

***Entities and Individuals***

15. ITC Middle East FZ-LLC ("ITC") was a United Arab Emirates ("UAE")-based trading company engaged in procurement, customs clearance, and logistics. ITC was formed on or about March 22, 2022, and registered as a free zone company. Companies created in UAE's free zones can be 100% owned and operated by non-UAE residents (i.e., foreign nationals) and are afforded tax exemptions on income and capital gains and on import and export duties.

16. Turbo Parts Solution FZE ("TPS") was a UAE-based free zone company. TPS was established on or about October 20, 2023, and was a subsidiary of ITC involved in the supply, maintenance, repair, and overhaul of parts for commercial aviation.

17. Russian Company A was a Saint Petersburg, Russia-based company involved in the wholesale trade of chemical products, repair, and maintenance of aircrafts and spacecrafts, as well as warehousing and storage activities.

18. Joint Stock Company Siberia Airlines d/b/a S7 Airlines ("S7 Airlines") was an airline headquartered in Moscow, Russia, with service hubs and offices in other parts of Russia. Starting on or about June 24, 2022, BIS has imposed consecutive Temporary Denial Orders ("TDO") against S7 Airlines, revoking its export and reexport privileges. TDOs may be issued by the Assistant Secretary for Export Enforcement "upon a showing by BIS that the order is necessary in the public interest to prevent an imminent violation of ECRA, the EAR, or any order, license or authorization issued thereunder," 15 CFR § 766.24. The S7 Airlines TDO has continuously been in effect since June 2022 and was most recently extended on December 13, 2024.

19. On or about February 23, 2024, S7 Engineering LLC a/k/a S7 Technics, a subsidiary of S7 Airlines, was added to the Specially Designated Nationals and Blocked Persons List ("SDN List") by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") for "operating or having operated in the aerospace sector of the Russian Federation economy." As a result, U.S. persons are generally prohibited from engaging in transactions with or for the benefit of S7 Engineering.

20. Public Joint Stock Company Aeroflot ("Aeroflot") was the flag carrier and largest airline in Russia. Since on or about April 7, 2022, BIS has denied Aeroflot its export and reexport privileges through a TDO. This denial of export privileges has continuously been in effect since April 2022 and was most recently extended on or about November 8, 2024.

21. Andrei SAMUILOVSKI ("SAMUILOVSKI") was a co-founder of ITC with citizenship in Estonia, Switzerland, and Russia.

22. Co-Conspirator 1 was a co-founder of ITC and a citizen of Finland but resided in the UAE. Co-Conspirator 1 is listed as the Chief Executive Officer/Executive Director of ITC on various sales and export-related documents obtained from U.S.-based manufacturers and distributors of commercial and military aerospace-related commodities.

23. Individual 1 is a Russian national residing in Russia who is the General Director of Russian Company A.

***Background of the Investigation and ITC***

24. According to electronic communication and multiple documents I obtained as part of this investigation, SAMUILOVSKI and Co-Conspirator 1 are the co-founders of UAE-based company ITC. SAMUILOVSKI and Co-Conspirator 1 were also responsible for establishing and managing ITC's bank accounts in the UAE used to receive funds from Russian buyers, like Russian Company A, and pay U.S. companies for components that were then illegally exported or re-exported to Russia.

25. ITC was setup by SAMUILOVSKI and Co-Conspirator 1 on or about March 22, 2022, approximately four weeks after Russia's invasion of Ukraine, an event which led to increased Russian export restrictions and sanctions imposed by the United States, European Union, and other countries. Because of these restrictions, Russian procurement actors established front companies in third countries (e.g., the UAE) to avoid scrutiny by U.S. law enforcement, circumvent U.S. export controls, and facilitate the illicit transshipment of U.S.-origin components to Russian end users.

26. Between in or around December 2022 and September 2024, according to records I reviewed in the Automated Export System ("AES"), the U.S. Government's system of record for tracking exports from the United States, there were approximately 89 direct shipments from

various U.S. companies to ITC. The items exported consisted primarily of aviation-related commodities with a cumulative value of approximately $1,919,180. International commercial trade data obtained by OEE via a subscription-based service showed that between July 3, 2022, and December 31, 2024, ITC was involved in approximately 1600 shipments of goods to Russia, totaling around $109 million. A significant portion of these shipments appeared to contain items made by U.S. manufacturers of aerospace components. From my assessment of the trade data, it appeared ITC procured large quantities of U.S.-origin components from Europe-based distributors, a common tactic employed by illicit procurement networks designed to obfuscate their supply chain and circumvent U.S. export laws.

27. In or around March 2024, ITC sent a letter to numerous U.S. companies, in which ITC indicated it had shifted its business operations to UAE-based TPS. The letter explained that all of ITC's future operations would be handled through its subsidiary company, TPS. According to AES data, between in or around April 2024 and February 2025, TPS was the listed ultimate consignee on approximately 47 shipments of U.S.-origin aviation-related items, purchased from various U.S. companies and valued collectively at approximately $1,394,825.

***ITC's and Russian Company A's Circumvention of U.S. Export Laws***

28. Based on messages exchanged on an encrypted messaging platform and email communications, in or around early 2022 or early 2023, SAMUILOVSKI and Co-Conspirator 1 entered into a business agreement with Russian Company A to supply prohibited Russian end users with aerospace-related goods.

29. On or about April 19, 2022, SAMUILOVSKI sent an email from his personal email account to his ITC email address titled "[Individual 2] contract" that included an attachment with no text in the body of the email. My review of the attached file revealed a contract, dated on or

about April 1, 2022, between ITC and Russian Company A for the procurement of aviation goods. The contract provided ITC as the seller of goods and Russian Company A as the buyer of goods with Co-Conspirator 1 listed as ITC's representative and Individual 1 as Russian Company A's signatory.

30. In or around early September 2022, SAMUILOVSKI and Co-Conspirator 1 communicated with each other regarding Individual 1's travel to the UAE. On or about September 3, 2022, SAMUILOVSKI messaged Co-Conspirator 1, "Turns out only [Individual 1] is coming, s7 thing is cancelled for now [emoji of person shrugging their shoulders] they want to see wants the situation with our bank."

31. On or about September 28, 2022, SAMUILOVSKI messaged Co-Conspirator 1, "Decided, basically we take small one, for the two of us…. But we split 3 way, as it's [Individual 2's] personal decision to join in, and use the address for orders and purchases/subscriptions." Co-Conspirator 1 replied shortly thereafter, "Ok sounds good" and then wrote, "But did you offer for him to just send the shit for free?"

32. On or about October 26, 2022, Individual 1 sent SAMUILOVSKI messages in Russian asking for ITC's login information and password to complete an account for an identified major international freight carrier. SAMUILOVSKI responded to Individual 1 approximately one-minute later with an ITC email address and password.

33. On or about November 16, 2022, Co-Conspirator 1 sent SAMUILOVSKI a message asking if he had a chance to read the draft contract. Less than a minute later, Co-Conspirator 1 sent a follow up text message that read, "And [Individual 1] and [Individual 2] want 220k in cash just so you know."

34. On or about December 28, 2023, SAMUILOVSKI, using his ITC email account, sent an untitled email to his personal email account and Co-Conspirator 1's personal email account which contained boarding passes for air travel from Moscow to Saint Petersburg, Russia, where Russian Company A is based.

35. On or about January 20, 2023, Co-Conspirator 1 texted SAMUILOVSKI and discussed Russian Company A's relationship with ITC. Specifically, Co-Conspirator 1 messaged SAMUILOVSKI, "send me the people in the office who are supposed to work for ITC Middle East . . . And tell them to cc me for any order they would like to make through us."

36. On or about February 1, 2023, SAMUILOVSKI, using his ITC email address, sent himself an email with no subject line that contained Russian text in the body of the email and an attachment titled, "CH Letter English.docx." The attached document contained the following message:

> The [Russian Company A] team has been working in the supply of aviation equipment, equipment for the aerospace industry and in related industries for over ten years.
>
> The [Russian Company A] team is included in the list of enterprises critical for the military-industrial complex of the Russian Federation.
>
> Our team took part in the implementation of various civil and military projects, namely:
>
> Participation in the implementation of programs for the construction of domestic aircraft Sukhoii Superjet SSJ 100, MS-21
>
> Participation in the implementation of programs for the construction of domestic unmanned aerial vehicles
> - Sirius, Scorpion, Orion, etc.
>
> Participation in the implementation of programs for the construction of domestic aviation developments of the fifth generation

> Construction of a new airport complex in St. Petersburg
>
> Construction of a new airport complex in the city of Simferopol
>
> We have a wide range of competencies for structuring projects of any complexity under severe sanctions restrictions and minimizing risks at all stages.
>
> Our permanent partners are the following government agencies and organizations:
>
> Ministry of Defense of the Russian Federation
> Ministry of Industry and Trade of the Russian Federation
> Rosoboronexport
> JSC Tactical Missiles Corporation
> JSC "Company Sukhoi"
> PJSC Irkut Corporation
> JSC "Kronstadt"
> United Aircraft Corporation (UAC RUSSIA)
> United Engine Corporation (UEC RUSSIA)
> Russian Helicopters JSC

The IP address associated with the email reveals the email was sent from Saint Petersburg, Russia.

37. The latter eight organizations in the letter are included on denied or blocked persons lists maintained by OFAC or BIS. These eight organizations were added to the BIS Entity List on or about March 3, 2022, almost eleven months before SAMUILOVSKI's email. Further, several of the companies – Rosoboronexport, United Aircraft Corporation, United Engine Corporation, and Russian Helicopters JSC – are subsidiaries of ROSTEC, the Russian state-owned defense conglomerate headquartered in Moscow. ROSTEC was added to OFAC's SDN List in June 2022.

***Russian Company A Employees' Use of ITC Email Accounts***

38. Between in or around March 2022 and October 2023, SAMUILOVSKI exchanged approximately 253 text messages with a Russian phone number saved under the contact name "Sergei IT Office" ("Sergei"). The messages, which were originally in Russian[2], reveal that

[2] Unless otherwise noted, communications in Russian were machine translated to English.

SAMUILOVSKI established ITC's website, email domain, email user accounts, and created email addresses and websites for two companies that are associated with ITC, including SamFam Trading LLC ("SamFam"). In or around March 2023, SAMUILOVSKI established SamFam in the UAE. SAMUILOVSKI is the CEO and owner of SamFam.

39. Between on or about April 11 and April 18, 2022, SAMUILOVSKI coordinated with Sergei to create the following ITC domain accounts:

a. a.samuilovski@itc-rfz.com
b. samir.fisher@itc-rfz.com
c. support@itc-rfz.com
d. info@itc-rfz.com
e. v.vilppula@itc-rfz.com

40. On or about April 19, 2022, samir.fisher@itc-rfz.com (hereafter the "Fisher Alias") sent an email to Individual 1's Russian Company A email address with no text in the body of the email. Approximately 25 minutes later, SAMUILOVSKI sent the Fisher Alias an email titled "Fwd: Signature Email" which contained ITC's signature block with address and contact information.

41. An analysis of IP address[3] access logs associated with the Fisher Alias and Individual 1 reveal approximately 200 instances when the Fisher Alias and Individual 1 utilized the same IP address from in or around April 2022 to June 2024. Between 2023 and 2024, there were approximately 16 occasions where both email addresses were accessed at the exact same date and time via the same IP address. Thus, I assess the Fisher Alias to be Individual 1 and/or other co-conspirators employed by Russian Company A.

---

[3] An Internet Protocol or "IP" address is a unique numerical label for devices on a computer network, similar to a street address for a house, that allows them to communicate with each other and access the Internet.

42. According to records obtained pursuant to legal process and provided by U.S. companies, ITC primarily used the Fisher Alias to communicate with dozens of U.S. and European companies to facilitate the procurement of aviation components.

43. On or about July 7, 2022, a Russian Company A employee sent Individual 1 and other co-conspirators employed by Russian Company A and email in Russian, which stated,

> Support Desk colleagues,
>
> According to my information, equipment for servers is being purchased.
>
> Please register the addresses of the following employees on the ITC Dubai @itc-rfz.com server
>
> [Russian Company A Employee 1]
> [Russian Company A Employee 2]
> [Russian Company A Employee 3]

44. Between on or about July 12 and July 14, 2023, SAMUILOVSKI coordinated with Sergei to create the following three Russian Company A users' email accounts using ITC's email domain:

a. [Russian Company A Employee 1]@itc-rfz.com
b. [Russian Company A Employee 2]@itc-rfz.com
c. [Russian Company A Employee 3]@itc-rfz.com

45. In communications with Sergei, SAMUILOVSKI acknowledged that ITC was used by individuals located in Russia. SAMUILOVSKI wrote in Russian, "Hi, can we make our office work through VPN? And then it seems that they blocked due to the fact that there were many IP addresses from Russia on the domain."

***Transactions with U.S. Company A***

46. U.S. Company A is a California-based company that operates as an aircraft parts distributor and maintenance, repair, and overhaul service provider.

47. On or about July 3, 2023, Individual 1 received an email from Aeroflot requesting a quote for an aviation battery assembly, part number 263BA101-2 ("Transaction 1"). On or about the same day, the Fisher Alias emailed U.S. Company A to request a quote on behalf of ITC for the same part number and quantity requested by Aeroflot. In response, a U.S. Company A representative emailed the Fisher Alias and requested end user information for the prospective sale.

48. On or about July 3, 2023, the Fisher Alias replied to the U.S. Company A representative that the end user was EgyptAir and the end destination for the components was Egypt.

49. On or about July 7, 2023, a Russian Company A employee emailed SAMUILOVSKI, Individual 1, and another Russian Company A employee an addendum to contract number "LW-2022-08-08/01" that extended the delivery date until July 17, 2023, "[d]ue to the delay in delivery of goods." The delivery was described as destined to the "territory of the Russian Federation" and in the amount of approximately $3,245,662 from August 22, 2022, to November 15, 2022. The Russian Company A employee requested SAMUILOVSKI sign the send the addendum back to Russian Company A.

50. On or about July 24, 2023, U.S. Company A confirmed to ITC via email that it had two units of the part number in stock. ITC subsequently provided a purchase order for the components. On or about the same day, U.S. Company A acknowledged the order and provided ITC a proforma invoice for Transaction 1 with wire transfer instructions and bank details for U.S. Company A. The total value for Transaction 1 was listed as $152,040.

51. On or about August 14, 2023, U.S. Company A confirmed receipt of payment to its U.S.-based bank account from ITC for Transaction 1 and later informed ITC on or about August 17, 2023, that Transaction 1 was ready to be shipped.

52. On or about August 18, 2023, a Russian Company A employee, while carbon copying Individual 1, emailed an identified UAE-based logistics company ("UAE Logistics Company") to arrange pick up of Transaction 1 at U.S. Company A's address in the United States.

53. On or about August 22, 2023, Transaction 1 was exported from the United States to ITC according to the EEI filing in AES.

54. On or about September 6, 2023, while conducting due diligence, a representative from an identified UAE-based financial institution ("UAE Bank") emailed Co-Conspirator 1 and SAMUILOVSKI to request supporting documentation and information surrounding the circumstances of a funds transfer to UAE Logistics Company. Co-Conspirator 1 forwarded the email from UAE Bank to the Fisher Alias. Later on or about the same day, a Russian Company A employee forwarded the original email chain from UAE Bank to Co-Conspirator 1 and the Fisher Alias, while carbon copying SAMUILOVSKI, with attached files named "MAWB 176-8046 8161.pdf" and "MAWB 17633164165.pdf." My review of the files disclosed two separate air waybills for the shipping of Transaction 1 from the United States to the UAE Logistics Company, and then from the UAE to Maldives Logistics Company.

55. On or about September 7, 2023, SAMUILOVSKI, with Co-Conspirator 1 carbon copied, responded to UAE Bank B and emailed them the two air waybills for Transaction 1 that a Russian Company A employee provided the day prior.

56. On or about September 8, 2023, a Russian Company A employee emailed another Russian Company A email account, while carbon copying Individual 1, files that contained Russian Customs Declaration forms. My review of the customs forms, translated from Russian to English, revealed Transaction 1 was re-exported from the Maldives to Russia – ITC was listed as

the seller and Russian Company A was listed as the buyer. Additionally, the customs declaration listed the contract number for Transaction 1 as "LW-2022-08-08/01."

57. On or about December 11, 2023, SAMUILOVSKI sent Co-Conspirator 1 a six-page contract, number "LW-2022-08-08/01," executed between ITC and Russian Company A. The contract was dated on or about August 8, 2022, and specified terms for ITC to deliver for import, and Russian Company A to buy goods for subsequent sale in the Russian Federation. The contract was signed by Co-Conspirator 1 on behalf of ITC as the seller of goods and signed by Individual 1 on behalf of Russian Company A as the buyer of goods.

58. A license determination by BIS showed that the battery assembly at issue is classified as EAR99 and has HTS-6 Code 850730. At the time the item was exported from the United States in connection with Transaction 1, as described above, the item required authorization from DOC to be exported to Russia or to Aeroflot, which none of the involved parties possessed.

***SAMUILOVSKI's and Co-Conspirator 1's Knowledge of U.S. Trade Laws***

59. SAMUILOVSKI and Co-Conspirator 1 employed several business strategies to circumvent U.S. export laws and conceal their illicit activities. As noted above, following Russia's invasion of Ukraine in or around February 2022, Co-Conspirator 1 and SAMUILOVSKI incorporated ITC in the UAE, a common tactic used to transship U.S.-origin items to prohibited destinations, such as Russia or Iran, in order to obfuscate the involvement of Russian or Iranian end-users. In this case, the transshipment companies include ITC and TPS – both controlled by Co-Conspirator 1 and SAMUILOVSKI – and other entities located in the Maldives and elsewhere.

60. Additionally, in or around early April 2022, Co-Conspirator 1 and SAMUILOVSKI communicated via a secure messaging application regarding a prospective transaction involving two identified Russia-based companies, Russian Company B and PAO Severstal. On or about

April 6, 2022, SAMUILOVSKI messaged Co-Conspirator 1, "For the email…. As through turkey is a problem right now, and the uae isn't fully functional, we were planning to use: severstal- >itc rus or [Russian Company B]-> ahtis firm -> buyer." Co-Conspirator 1 responded approximately one minute later and wrote, "Yeah I thought so. Even if it was ITC Middle East always good to have more steps away from [PAO] sverstal." SAMUILOVSKI replied, "Exactly." In or around June 2022, OFAC added PAO Severstal to the SDN List in furtherance of sanctions targeting Russian oligarchs and elites.

61. Further, the investigation has revealed that SAMUILOVSKI and Co-Conspirator 1 were aware of the U.S. designation status of certain of their Russian customers. On or about December 14, 2022, SAMUILOVSKI sent a text message to Co-Conspirator 1 asking him if he thought he would make it to Russia that weekend, and then wrote, "Also [Individual 1] was wondering if s7 money got released?" Co-Conspirator 1 responded approximately 13 minutes later, "For S7 not yet we answered only late yesterday so hopefully today afternoon."

62. On or about December 21, 2022, SAMUILOVSKI sent messages to Co-Conspirator 1 inquiring about sanctions on Russia-based S7 Airlines, writing, "Just spent half an hour . . . trying to find sanctions against s7 ingenering [shrug emoji] can't find shit." He went on to write, "We should ask the bank for their docs on why they think s7 is under sanctions [shrug emoji]." Co-Conspirator 1 replied to SAMUILOVSKI two-minutes later, "S7 engineering is owned 100% directly by S7 airlines. Seven airlines is sanctioned by the United Staes and Ukraine. You can find it on the first page of Googe [shrug emoji]."

63. While S7 was not the target of blocking sanctions administered by OFAC, as discussed above, S7 was the subject of a TDO originally issued on or about June 24, 2022. The

TDO was renewed on or about December 20, 2022, and remains in effect. The TDO denied S7's ability to export items from the United States.

64. On or about July 29, 2023, a BIS representative stationed at the U.S. Consulate in Dubai, UAE, emailed ITC to request a meeting to discuss U.S. export controls and recent shipments ITC received from the United States. After no response, on or about September 8, 2023, the BIS representative emailed SAMUILOVSKI directly and forwarded the original email with a request for ITC to confirm receipt of certain U.S. components and inform BIS on the disposition of the items (*e.g.*, resale, local use, or currently in inventory). Based on records obtained pursuant to legal process, approximately three and a half hours later, SAMUILOVSKI forwarded the email chain to Individual 1 at Russian Company A.

65. On or about December 15, 2023, the same BIS official from the U.S. Consulate in Dubai emailed two ITC email accounts requesting a meeting to discuss a shipment of aviation components that was exported from the United States to ITC on or about October 24, 2023. On the same day, the email was forwarded by one of the ITC employees to SAMUILOVSKI and Individual 1. The employee wrote, "I would suggest that we should avoid communicating with [BIS] without a good reason." Based on my training and experience, entities and individuals who intentionally avoid meeting with BIS for end-use checks are oftentimes engaged in criminal activity.

## **CONCLUSION**

66. Based on the forgoing, I submit there is probable cause to believe that SAMUILOVSKI committed violations of 18 U.S.C. §§ 371 (conspiracy), 1956(h) (conspiracy to launder monetary instruments), 554 (smuggling from the United States), and 50 U.S.C. § 4819 (ECRA).

Respectfully submitted,

Samuel Brown
Special Agent
U.S. Department of Commerce
Bureau of Industry and Security
Office of Export Enforcement

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 on October 10, 2025.

MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE