**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>v.<br>**ANDREI SAMUILOVSKI,**<br>**Defendant.** | **Criminal No. 26-cr-188 (CJN)** |

## STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorneys, and the defendant, **ANDREI SAMUILOVSKI**, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea – that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt. These facts do not constitute all facts known to the parties concerning the charged offense and covered conduct. This statement is being submitted by the parties to demonstrate that sufficient facts exist to establish that the defendant committed the offense to which he is pleading guilty.

### Background

1. The Export Control Reform Act of 2018 ("ECRA") provides statutory authority for the government to regulate exports from the United States to further the national security and foreign policy of the United States. 50 U.S.C. § 4811(2). Specifically, ECRA grants the President the authority to control, *inter alia*, the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by U.S. or foreign persons. *Id.* § 4812(a).

2. It is unlawful for a person to willfully violate, attempt to violate, conspire to violate, or cause a violation of ECRA or of any regulation, order, license, or other authorization issued under ECRA. *Id.* § 4819.

3. The Export Administration Regulations ("EAR"), Title 15, Code of Federal Regulations, Parts 730-774, were promulgated by the United States Department of Commerce, Bureau of Industry and Security ("BIS") pursuant to ECRA. In particular, the EAR restrict the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. The EAR impose licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully re-exported from one foreign destination to another. The most sensitive items subject to EAR controls are identified on the DOC's Commerce Control List ("CCL"), published at 15 C.F.R. part 774, Supp. No. 1. Items on the CCL are categorized by Export Control Classification Number ("ECCN"), each of which has export control requirements depending on destination, end use, and end user.[1]

4. On or about February 24, 2022, in response to Russia's invasion of Ukraine, BIS amended the EAR to, among other things, require a license for exports or reexports to Russia of items classified under any ECCN in Categories 3 through 9 of the CCL. 87 Fed. Reg. 12226 (March 3, 2022). Effective April 8, 2022, BIS again amended the EAR to require a license for all items on the CCL destined for Russia. 87 Fed. Reg. 22130 (April 14, 2022).

5. In addition, BIS has identified six-digit Harmonized Tariff Schedule ("HTS") Codes that correspond to items that Russia seeks to procure for or in support of its war effort. Such codes, also referred to as HTS-6 Codes, are identified in Supplement No. 4 to 15 C.F.R. § 746 (Russian and Belarusian Industry Sector Sanctions Pursuant to 15 C.F.R. § 746.5(a)(1)(ii)). Under

---

[1] ECCNs are five-character, alpha-numeric designations used on the CCL to identify dual-use items for export control purposes. An ECCN categorizes items based on the nature of the product, i.e., type of commodity, software, or technology and its respective technical parameters. 15 C.F.R. § 738.2.

the EAR, an export license is required to export, reexport, or transfer (in-country) any item identified in Supplement No. 4 to or within Russia or Belarus, subject to limited exception. Such license applications are reviewed under a policy of denial.

## ECRA Violations

6. Beginning in or around early 2022 and continuing through at least December 2024, SAMUILOVSKI and others combined to supply prohibited Russian end users with aerospace-related components, in violation of U.S. export laws.

### *Entities and Individuals*

7. ITC Middle East FZ-LLC ("ITC") was a United Arab Emirates ("UAE")-based trading company engaged in procurement, customs clearance, and logistics. ITC was formed on or about March 22, 2022, and registered as a free zone company. Companies created in UAE's free zones can be 100% owned and operated by non-UAE residents (i.e., foreign nationals) and are afforded tax exemptions on income and capital gains and on import and export duties.

8. Russian Company A was a Saint Petersburg, Russia-based company involved in the wholesale trade of chemical products and products for the repair and maintenance of aircrafts and spacecrafts, as well as warehousing and storage activities.

9. Joint Stock Company Siberia Airlines d/b/a S7 Airlines ("S7 Airlines") was an airline headquartered in Moscow, Russia, with service hubs and offices in other parts of Russia. Starting on or about June 24, 2022, BIS has imposed consecutive Temporary Denial Orders ("TDO") against S7 Airlines, revoking its export and reexport privileges. TDOs may be issued by the Assistant Secretary for Export Enforcement "upon a showing by BIS that the order is necessary in the public interest to prevent an imminent violation of ECRA, the EAR, or any order, license or

authorization issued thereunder," 15 CFR § 766.24. The S7 Airlines TDO has continuously been in effect since June 2022 and was most recently extended on December 13, 2024.

10. On or about February 23, 2024, S7 Engineering LLC a/k/a S7 Technics, a subsidiary of S7 Airlines, was added to the Specially Designated Nationals and Blocked Persons List ("SDN List") by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") for "operating or having operated in the aerospace sector of the Russian Federation economy." As a result, U.S. persons are generally prohibited from engaging in transactions with or for the benefit of S7 Engineering.

11. Public Joint Stock Company Aeroflot ("Aeroflot") was the flag carrier and largest airline in Russia. Since on or about April 7, 2022, BIS has denied Aeroflot its export and reexport privileges through a TDO. This denial of export privileges has continuously been in effect since April 2022.

12. SAMUILOVSKI was a co-founder of ITC with citizenship in Estonia, Switzerland, and Russia.

13. Co-Conspirator 1 was a co-founder of ITC and a citizen of Finland but resided in the UAE. Co-Conspirator 1 is listed as the Chief Executive Officer/Executive Director of ITC on various sales and export-related documents obtained from U.S.-based manufacturers and distributors of commercial and military aerospace-related commodities.

14. Individual 1 was a Russian national residing in Russia who was the General Director of Russian Company A.

15. Individual 2 was a Russian national residing in Russia who was the founder and owner of Russian Company A.

***Background Regarding ITC***

16. SAMUILOVSKI and Co-Conspirator 1 were the co-founders of ITC. SAMUILOVSKI and Co-Conspirator 1 were also responsible for establishing and managing ITC's bank accounts in the UAE that were used to receive funds from Russian buyers, like Russian Company A, and pay U.S. companies for components that were then illegally exported or re-exported to Russia.

17. SAMUILOVSKI and Co-Conspirator 1 began the process of establishing ITC in early 2022. On or about March 22, 2022, ITC was officially established, approximately four weeks after Russia's invasion of Ukraine, an event which led to increased Russian export restrictions and sanctions imposed by the United States, European Union, and other countries.

18. Between in or around December 2022 and in or around September 2024, there were dozens of shipments from various U.S. companies to ITC, as well as other shipments of U.S.-origin goods to ITC. The U.S. origin items exported or reexported consisted primarily of export-controlled aerospace-related commodities with a cumulative value of approximately $1,925,755.00. These items ultimately were reexported to Russia. Of those U.S. origin exports, SAMUILOVSKI acknowledges and admits that ITC's profit totaled USD $389,491.30.

***ITC's and Russian Company A's Circumvention of U.S. Export Laws***

19. After Russia's invasion of Ukraine, SAMUILOVSKI and Co-Conspirator 1 entered into a business agreement with Russian Company A to supply prohibited Russian end users with aerospace-related goods.

20. On or about April 19, 2022, SAMUILOVSKI sent an email from his personal email account to his ITC email address titled "[Individual 2] contract" that included an attachment with no text in the body of the email. The attached file was a contract, dated on or about April 1, 2022,

between ITC and Russian Company A for the procurement of aerospace goods. The contract identified ITC as the seller of goods and Russian Company A as the buyer of goods with Co-Conspirator 1 listed as ITC's representative and Individual 1 as Russian Company A's signatory.

21. In or around early September 2022, SAMUILOVSKI and Co-Conspirator 1 communicated with each other regarding Individual 1's travel to the UAE. On or about September 3, 2022, SAMUILOVSKI messaged Co-Conspirator 1, "Turns out only [Individual 1] is coming, s7 thing is cancelled for now [emoji of person shrugging their shoulders] they want to see wants (*sic*) the situation with our bank."

22. On or about October 26, 2022, Individual 1 sent SAMUILOVSKI messages asking for ITC's login information and password to complete an account for an identified major international freight carrier. SAMUILOVSKI responded to Individual 1 approximately one-minute later with an ITC email address and password.

23. On or about November 16, 2022, Co-Conspirator 1 sent SAMUILOVSKI a message asking if he had a chance to read the draft contract.

24. On or about December 28, 2022, SAMUILOVSKI, using his ITC email account, sent an untitled email to his personal email account and Co-Conspirator 1's personal email account which contained boarding passes for air travel from Moscow to Saint Petersburg, Russia, where Russian Company A is based.

25. On or about January 20, 2023, Co-Conspirator 1 texted SAMUILOVSKI and discussed Russian Company A's relationship with ITC. Specifically, Co-Conspirator 1 messaged SAMUILOVSKI, "send me the people in the office who are supposed to work for ITC Middle East . . . And tell them to cc me for any order they would like to make through us."

***Russian Company A Employees' Use of ITC Email Accounts***

26. Between in or around March 2022 and in and around October 2023, SAMUILOVSKI exchanged approximately 253 text messages with a Russian phone number saved under the contact name "Sergei IT Office" ("Sergei"). As the messages show, during that time SAMUILOVSKI established ITC's website, email domain, email user accounts, and created email addresses and websites for two companies that are associated with ITC, including a trading company SAMUILOVSKI established in the UAE in or around March 2023.

27. Between on or about April 11, 2022, and on or about April 18, 2022, SAMUILOVSKI coordinated with Sergei to create the following ITC domain accounts:

a. a.samuilovski@itc-rfz.com
b. samir.fisher@itc-rfz.com
c. support@itc-rfz.com
d. info@itc-rfz.com
e. v.vilppula@itc-rfz.com

28. On or about April 19, 2022, samir.fisher@itc-rfz.com (hereafter the "Fisher Alias") sent an email to Individual 1's Russian Company A email address with no text in the body of the email. Approximately 25 minutes later, SAMUILOVSKI sent the Fisher Alias an email titled "Fwd: Signature Email" which contained ITC's signature block with address and contact information.

29. Between April 2022 and June 2024, Individual 1 and/or other co-conspirators employed by Russian Company A extensively used the Fisher Alias.

30. ITC primarily used the Fisher Alias to communicate with dozens of U.S. and European companies to facilitate the procurement of aerospace components.

31. On or about July 7, 2022, a Russian Company A employee sent Individual 1 and other co-conspirators employed by Russian Company A an email that stated:

> Support Desk colleagues,
>
> According to my information, equipment for servers is being purchased.
>
> Please register the addresses of the following employees on the ITC Dubai @itc-rfz.com server
>
> [Russian Company A Employee 1]
> [Russian Company A Employee 2]
> [Russian Company A Employee 3]

32. Between on or about July 12, 2023, and on or about July 14, 2023, SAMUILOVSKI coordinated with Sergei to create the following three Russian Company A users' email accounts using ITC's email domain:

a. [Russian Company A Employee 1]@itc-rfz.com
b. [Russian Company A Employee 2]@itc-rfz.com
c. [Russian Company A Employee 3]@itc-rfz.com

33. In communications with Sergei, SAMUILOVSKI acknowledged that ITC was used by individuals located in Russia. For example, SAMUILOVSKI wrote, "Hi, can we make our office work through VPN? And then it seems that they blocked due to the fact that there were many IP addresses from Russia on the domain."

***Transactions with U.S. Company A***

34. U.S. Company A was a California-based company that operated as an aircraft parts distributor and maintenance, repair, and overhaul service provider.

35. On or about July 3, 2023, Individual 1 received an email from Aeroflot requesting a quotation for an aerospace battery assembly, part number 263BA101-2 ("Transaction 1"). On or about the same day, the Fisher Alias emailed U.S. Company A to request a quote on behalf of ITC for the same part number and quantity requested by Aeroflot. In response, a U.S. Company A representative emailed the Fisher Alias and requested end user information for the prospective sale.

36. On or about July 3, 2023, the Fisher Alias replied to the U.S. Company A representative that the end user was EgyptAir and the end destination for the components was Egypt.

37. On or about July 7, 2023, a Russian Company A employee emailed SAMUILOVSKI, Individual 1, and another Russian Company A employee an addendum to contract number "LW-2022-08-08/01" that extended the delivery date until July 17, 2023, "[d]ue to the delay in delivery of goods." The delivery was described as destined to the "territory of the Russian Federation" and in the amount of approximately $3,245,662 from August 22, 2022, to November 15, 2022. The Russian Company A employee requested SAMUILOVSKI sign and send the addendum back to Russian Company A.

38. On or about July 24, 2023, U.S. Company A confirmed to ITC via email that it had two units of the part number in stock. ITC subsequently provided a purchase order for the components. On or about the same day, U.S. Company A acknowledged the order and provided ITC a pro forma invoice for Transaction 1 with wire transfer instructions and bank details for U.S. Company A. The total value for Transaction 1 was listed as $152,040.

39. On or about August 14, 2023, U.S. Company A confirmed receipt of payment to its U.S.-based bank account from ITC for Transaction 1 and informed ITC on or about August 17, 2023, that Transaction 1 was ready to be shipped.

40. On or about August 18, 2023, a Russian Company A employee, while carbon copying Individual 1, emailed a UAE-based logistics company ("UAE Logistics Company") to arrange pick up of Transaction 1 at U.S. Company A's address in the United States.

41. On or about August 22, 2023, Transaction 1 was exported from the United States to ITC.

42. On or about September 6, 2023, while conducting due diligence, a representative from a UAE-based financial institution ("UAE Bank") emailed Co-Conspirator 1 and SAMUILOVSKI to request supporting documentation and information surrounding the circumstances of a funds transfer to UAE Logistics Company. Co-Conspirator 1 forwarded the email from UAE Bank to the Fisher Alias. Later on or about the same day, a Russian Company A employee forwarded the original email chain from UAE Bank to Co-Conspirator 1 and the Fisher Alias, while carbon copying SAMUILOVSKI, with attached files named "MAWB 176-8046 8161.pdf" and "MAWB 17633164165.pdf." These files were two separate air waybills for the shipping of Transaction 1 from the United States to the UAE Logistics Company, and then from the UAE to Maldives Logistics Company.

43. On or about September 7, 2023, SAMUILOVSKI, with Co-Conspirator 1 carbon copied, responded to UAE Bank B and emailed them the two air waybills for Transaction 1 that a Russian Company A employee provided the day prior.

44. On or about September 8, 2023, a Russian Company A employee emailed another Russian Company A email account, while carbon copying Individual 1, files that contained Russian Customs Declaration forms. Transaction 1 had been re-exported from the Maldives to Russia – ITC was listed as the seller and Russian Company A was listed as the buyer. Additionally, the customs declaration listed the contract number for Transaction 1 as "LW-2022-08-08/01."

45. On or about December 11, 2023, SAMUILOVSKI sent Co-Conspirator 1 a six-page contract, number "LW-2022-08-08/01," executed between ITC and Russian Company A. The contract was dated on or about August 8, 2022, and specified terms for ITC to deliver for import, and Russian Company A to buy, goods for subsequent sale in the Russian Federation. The contract

was signed by Co-Conspirator 1 on behalf of ITC as the seller of goods and signed by Individual 1 on behalf of Russian Company A as the buyer of goods.

46. A license determination by BIS showed that the battery assembly at issue is classified as EAR99 and has HTS-6 Code 850730. At the time the item was exported from the United States in connection with Transaction 1, as described above, the item required authorization from the U.S. Department of Commerce to be exported or reexported to Russia or to Aeroflot, which none of the involved parties applied for or possessed.

***SAMUILOVSKI's and Co-Conspirator 1's Knowledge of U.S. Trade Laws***

47. From at least 2022 until present, SAMUILOVSKI was familiar with U.S. export control laws and knew that U.S. export controls, including licensing requirements, applied to U.S.-origin items. SAMUILOVSKI knew that the items he, ITC, or his co-conspirators purchased or caused to be purchased from U.S. companies would be reexported to Russia. Despite this knowledge and his knowledge of U.S. export controls, SAMUILOVSKI willfully conducted the transactions described above with the intent of providing export-controlled items to end users in Russia, in violation of U.S. laws.

48. SAMUILOVSKI and Co-Conspirator 1 employed several business strategies to circumvent U.S. export laws and conceal their illicit activities. Among these was to use ITC -- which was based in the UAE and controlled by Co-Conspirator 1 and SAMUILOVSKI -- and other entities located in the Maldives and elsewhere to transship U.S.-origin items to prohibited destinations, such as Russia.

49. Additionally, in or around early April 2022, Co-Conspirator 1 and SAMUILOVSKI communicated via a secure messaging application regarding a prospective transaction involving two identified Russia-based companies, Russian Company B and PAO Severstal. On or about

April 6, 2022, SAMUILOVSKI messaged Co-Conspirator 1, "For the email.... As through turkey is a problem right now, and the uae isn't fully functional, we were planning to use: severstal- >itc rus or [Russian Company B]-> ahtis firm -> buyer." Co-Conspirator 1 responded approximately one minute later and wrote, "Yeah I thought so. Even if it was ITC Middle East always good to have more steps away from [PAO] sverstal." SAMUILOVSKI replied, "Exactly." In or around June 2022, OFAC added PAO Severstal to the SDN List in furtherance of sanctions targeting Russian oligarchs and elites.

50. SAMUILOVSKI and Co-Conspirator 1 were aware of the U.S. designation status of certain of their Russian customers. On or about December 14, 2022, SAMUILOVSKI sent a text message to Co-Conspirator 1 asking him if he thought he would make it to Russia that weekend, and then wrote, "Also [Individual 1] was wondering if s7 money got released?" Co-Conspirator 1 responded approximately 13 minutes later, "For S7 not yet we answered only late yesterday so hopefully today afternoon."

51. On or about December 21, 2022, SAMUILOVSKI sent messages to Co-Conspirator 1 inquiring about sanctions on Russia-based S7 Airlines, writing, "Just spent half an hour . . . trying to find sanctions against s7 ingenering (*sic*) [shrug emoji] can't find shit." He went on to write, "We should ask the bank for their docs on why they think s7 is under sanctions [shrug emoji]." Co-Conspirator 1 replied to SAMUILOVSKI two-minutes later, "S7 engineering is owned 100% directly by S7 airlines. Seven airlines is sanctioned by the United Staes and Ukraine. You can find it on the first page of Googe [shrug emoji]."

52. While S7 was not the target of blocking sanctions administered by OFAC, as discussed above, S7 was the subject of a TDO originally issued on or about June 24, 2022. The

TDO was renewed on or about December 20, 2022, and remains in effect. The TDO denied S7's ability to export items from the United States.

53. On or about July 29, 2023, a BIS representative stationed at the U.S. Consulate in Dubai, UAE, emailed ITC to request a meeting to discuss U.S. export controls and recent shipments ITC received from the United States. After no response, on or about September 8, 2023, the BIS representative emailed SAMUILOVSKI directly and forwarded the original email with a request for ITC to confirm receipt of certain U.S. components and inform BIS on the disposition of the items (*e.g.*, resale, local use, or currently in inventory). Approximately three and a half hours later, SAMUILOVSKI forwarded the email chain to Individual 1 at Russian Company A.

54. On or about December 15, 2023, the same BIS official from the U.S. Consulate in Dubai emailed two ITC email accounts requesting a meeting to discuss a shipment of aerospace components that was exported from the United States to ITC on or about October 24, 2023. On the same day, the email was forwarded by one of the ITC employees to SAMUILOVSKI and Individual 1. The employee wrote, "I would suggest that we should avoid communicating with [BIS] without a good reason."

**LIMITED NATURE OF PROFFER**

55. This proffer of evidence is not intended to constitute a complete statement of all facts known by SAMUILOVSKI but is a minimum statement of facts intended to provide the necessary factual predicate for the guilty plea. The limited purpose of this proffer is to demonstrate that there exists a sufficient legal basis for defendant's plea of guilty to the charged offense. As to the other co-conspirators identified herein and the Criminal Information, SAMUILOVSKI admits that the allegations in the Criminal Information are true, or he does not have information to dispute or disprove those allegations set forth in the Criminal Information in any way.

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

STEVEN B. WASSERMAN
Assistant United States Attorney
D.C. Bar No. 453251
601 D Street, N.W.
Washington, D.C. 20579
Office: (202) 252-7719
Steve.Wasserman@usdoj.gov

JOHN A. EISENBERG
ASSISTANT ATTORNEY GENERAL
FOR NATIONAL SECURITY

SEAN R. HEIDEN
Acting Deputy Chief
BRETT RUFF
Trial Attorney
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
Heiden: (202) 514-8106
Sean.Heiden2@usdoj.gov
Ruff: (202) 616-0736
Brett.Ruff@usdoj.gov

**DEFENDANT'S ACKNOWLEDGEMENT**

I, Andrei Samuilovski, have read this Statement of the Offense and have discussed it with my attorneys. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 09-14-26

Andrei Samuilovski
Defendant

**ATTORNEYS' ACKNOWLEDGEMENT**

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 9/14/2026

David C. Rybicki
K&L GATES LLP
Attorney for Defendant

Date: 9/14/2026

Robert S. Silverblatt
K&L GATES LLP
Attorney for Defendant